**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| FRANKLIN ARMORY, INC.,<br><br>               Plaintiff,<br><br>    v.<br><br>COL. PATRICK A. CALLAHAN, individually and in his capacity as Superintendent of New Jersey State Police; ATTORNEY GENERAL OF THE STATE OF NEW JERSEY GURBIR GREWAL, individually and his official capacity as Attorney General, DETECTIVE BRETT C. BLOOM; DETECTIVE J. HEARNE; LT. STEPHEN MAZZAGATTI; DEPUTY ATTORNEY GENERAL MARYBETH WOODS; and JOHN DOES 1- 10, fictitious parties;<br><br>               Defendants. | Civ. Action No. 19-19323 (FLW)<br><br>**OPINION** |

**<u>WOLFSON, Chief Judge</u>:**

Before the Court is defendants, Patrick A. Callahan, Gurbir Grewal,[1] and MaryBeth Woods' ("Defendants") motion (the "Motion") to dismiss plaintiff Franklin Armory, Inc.'s ("Plaintiff") Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[2]

---

[1] Grewal is no longer the Attorney General. Accordingly, the Acting Attorney General, Andrew Bruck, is automatically substituted. Fed. R. Civ. P. 25(d).

[2] Defendants Brett C. Bloom, J. Hearne, and Steven Mazzagatti have not been served with the Amended Complaint. As such, Defendants' Motion addresses only the claims against defendants Callahan, Grewal, and Woods.

The Amended Complaint alleges that Defendants violated the Second Amendment, the Due Process Clause of the Fourth Amendment, and acted arbitrarily and capriciously, by determining—incorrectly, according to Plaintiff—that a firearm Plaintiff seeks to sell in New Jersey is prohibited under New Jersey law. Plaintiff opposes the Motion. For the reasons set forth herein, Defendants' Motion is **GRANTED**. Plaintiff is given leave to amend its complaint in order to plausibly allege only its Second Amendment claim, consistent with the principles set forth in this Opinion. Plaintiff's due process claim is dismissed with prejudice.

## I.     BACKGROUND AND PROCEDURAL HISTORY

### A.     Legislative and Regulatory Background

The National Firearms Act, 26 U.S.C. § 5801, *et seq.* ("NFA"), imposes taxes on the manufacture, sale, and transfer, and requires registration, of certain firearms. 26 U.S.C. §§ 5811, 5821, 5841. Among the firearms covered under the NFA are rifles with a barrel less than 16-inches long and shotguns with a barrel less than 18-inches long. 26 U.S.C. §5845(a). The NFA defines a "rifle" as

> a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

26 U.S.C. §5845(c). A "shotgun" is defined as

> a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed shotgun shell.

26 U.S.C. §5845(d).

Separate from the NFA, the Gun Control Act, 18 U.S.C. §§ 921, *et seq.* ("GCA"), which was enacted in 1968, imposes a regulatory scheme on the importation, manufacturing, and sale of

firearms, including restrictions on the sale of certain types of firearms. Under one such restriction, it is "unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver . . . to any person any . . . short-barreled shotgun[] or short-barreled rifle . . .[,] except as specifically authorized by the Attorney General consistent with public safety and necessity." 18 U.S.C. § 922(b)(4). As relevant here, a "short-barreled shotgun" is a "shotgun" with a barrel less than 18-inches long, and a "short-barreled rifle" is a "rifle" with a barrel less than 16-inches long. 18 U.S.C. §§ 921(a)(6) and (8). The GCA defines shotguns and rifles as follows:

> (5) The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.
> . . .
> (7) The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.

18 U.S.C. §§ 921(a).

New Jersey has also enacted state statutes regulating the manufacture, sale, and possession of firearms. In particular, the New Jersey statutes prohibit the possession, manufacture, and sale of "[s]awed-off shotguns." N.J.S.A. 2C:39-3(b); N.J.S.A. 2C:39-9(b). A "[s]awed-off shotgun" is defined as, *inter alia*, "any shotgun" with a barrel less than 18-inches long and a "rifle" with a barrel less than 16-inches long. N.J.S.A. 2C:39-1(o). The statute defines rifles and shotguns as follows:

> m. "Rifle" means any firearm designed to be fired from the shoulder and using the energy of the explosive in a fixed metallic cartridge to fire a single projectile through a rifled bore for each single pull of the trigger.
>
> n. "Shotgun" means any firearm designed to be fired from the shoulder and using the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shots or a single projectile for each pull of the trigger, or any firearm designed to be fired from the shoulder which does not fire fixed ammunition.

N.J.S.A. 2C:39-1.

**B.**     **Relevant Conduct**

Plaintiff is a federally licensed manufacturer of firearms and firearm parts organized under the laws of the State of Nevada with a principal place of business in Nevada. Am. Compl. ¶8. As relevant here, Plaintiff manufactures a firearm called the Reformation. *Id.* ¶25. According to Plaintiff, the Reformation "is unique in its design and characteristics in that it is designed and intended to expel a single projectile through an unrifled barrel that has straight-cut lands-and-grooves." *Id.* ¶26. The Reformation "is designed and intended to fire standard cartridge ammunition" rather than "fixed shotgun shells." *Id.* ¶27.

In 2018, Plaintiff submitted the Reformation to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("BATF"), a federal agency, to evaluate its design for purposes of classification. *Id.* ¶28. Because the Reformation does not have a "rifled bore" and does not use a "fixed shotgun shell," the BATF determined that the Reformation does not qualify as a rifle or shotgun regulated under the NFA. *Id.* ¶29. Instead, the BATF determined that the Reformation qualifies as a "shotgun" and a "short-barreled shotgun" under the GCA, *id.* ¶30, as it is designed to be "fired from the shoulder," it has a "smooth bore," it fires a "single projectile," and it has a barrel that is 18-inches long. *Id.* Ex. B. Plaintiff alleges that the Reformation "is subject to the GCA only and can be sold in the general channels of interstate commerce subject to that Act's requirements and state law." *Id.*

In 2019, after reviewing the relevant state laws, Plaintiff began taking steps to sell the Reformation in New Jersey, including by communicating, and entering into at least one sales contract, with a New Jersey firearms retailer. *Id.* ¶¶31–32. In response, one retailer contacted the New Jersey State Police ("NJSP") regarding the legality of selling the Reformation. *Id.* ¶33. Detective J. Hearne ("Det. Hearne") of the NJSP replied that the Reformation "would be eligible for sale" in New Jersey and that it "fits within the laws of the State as legal." *Id.* ¶34. However, Det. Hearne warned that several firearms manufactured in recent years managed to fall outside the scope

of state laws and may be banned in the future. *Id.* ¶35. Det. Hearne also requested from Plaintiff a

formal letter describing the characteristics of the Reformation. *Id.* ¶36. Plaintiff complied with the

request by letter dated March 13, 2019, but Plaintiff informed Det. Hearne that it would begin

distributing the Reformation in New Jersey within 30 days unless the State advised that a relevant

law prohibited such sales. *Id.* ¶¶36–37.

On April 3, 2019, Detective Brett C. Bloom ("Det. Bloom"), who is the Assistant Head of

the NJSP Firearms Investigation Unit, replied to Plaintiff. *Id.* ¶38. Det. Bloom confirmed that New

Jersey law did not prohibit the sale of the Reformation. *Id.* However, Det. Bloom advised Plaintiff

as follows:

> While I agree with you that under New Jersey State law, your product does not conform to
> the State definition of a "shotgun" or "rifle" or "handgun,["] it has been deemed a
> "shotgun["] by the BATF. With this designation, our concern is that the sale of such a
> product may be interpreted as a "shotgun" but [*sic*] a State or County prosecutors and an
> owner may be prosecuted for same. This may also include charges related to the possession
> of an "assault firearm" and/or a "sawed-off-shotgun" if it is believed to be a shotgun by the
> prosecutor's office.

*Id.* ¶39. Det. Bloom further informed Plaintiff that he would request a "legal opinion" from the

Office of the Attorney General of New Jersey and advised Plaintiff not to distribute the Reformation

for sale in New Jersey until receiving the State's response. *Id.* ¶¶41–42. While waiting for the State's

response, on April 26, 2019, a retailer cancelled its contract with Plaintiff to sell the Reformation.

*Id.* ¶45.

On July 17, 2019, Lieutenant Stephen Mazzagatti ("Lt. Mazzagatti") of the NJSP sent a

letter (the "July 17, 2019 Letter") informing Plaintiff that the Reformation does "not meet the

statutory requirements of legal shotguns in New Jersey." *Id.* ¶50 and Ex. G.[3] According to Lt.

---

[3] At the pleading stage, the Court may consider "allegations contained in the complaint, exhibits
attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d
Cir. 2014).

Mazzagatti, the Reformation "appear[s] to fit the category of a shotgun under New Jersey law" because "the barrel[] [is] not rifled[,] the firearm[] [is] designed to fire from the shoulder, and the firearm[] fire[s] a single projectile for each pull of the trigger." *Id.* Further, Lt. Mazzagatti explained that the Reformation qualifies as a "sawed-off shotgun" under New Jersey law because, according to the State, it is a "shotgun" with a barrel less than 18-inches long. *Id.* ¶¶52–53. Likewise, Lt. Mazzagatti asserted that the Reformation also qualifies as an "assault weapon[]" under New Jersey law because it is a "shotgun" with a magazine capacity greater than six rounds. *Id.* ¶54. Lt. Mazzagatti explained that the letter "is not intended as legal advice but is offered for informational purposes only." *Id.* ¶55.

Plaintiff alleges that the July 17, 2019 Letter improperly classified the Reformation as a "shotgun." According to Plaintiff, the letter failed to acknowledge that the Reformation does not use a "fixed shotgun shell," which is an element of a "shotgun" under New Jersey's definition. *Id.* ¶51. Because the Reformation does not qualify as a "shotgun," Plaintiff further maintains that it cannot qualify as a "sawed-off shotgun" or an "assault weapon." *Id.* ¶¶53–54. Plaintiff alleges that Lt. Mazzagatti prepared the July 17, 2019 Letter with input and guidance from Deputy Attorney General MaryBeth Woods, as well as other members of the Attorney General's Office, including former Attorney General Grewal. *Id.* ¶57.

Plaintiff further alleges that the July 17, 2019 Letter is part of a "an overall policy being employed by [Attorney General] Grewal and [defendant Patrick A. Callahan, the Superintendent of the NJSP,]" that is designed "to restrict or lessen the sale of lawful firearms and/or prevent citizens of New Jersey from obtaining lawful firearms." *Id.* ¶64. As evidence of such a policy, Plaintiff alleges that former Attorney General Grewal responded to municipal resolutions recognizing citizens' Second Amendment rights with statements expressing concern "that these so-called

'sanctuary' resolutions will confuse otherwise law-abiding residents, who may incorrectly believe that they no longer have to comply with firearm safety laws." *Id.* ¶66.

## C.   Plaintiff's Claims

In response, Plaintiff filed a Complaint against various state entities and officials. ECF No. 1. The defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 11. On January 22, 2021, the Court issued an Opinion dismissing all of Plaintiff's claims with prejudice except for two counts seeking relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and 42 U.S.C. § 1983, against Grewal and Callahan for violations of the Second and Fourteenth Amendments. ECF No. 20. The Court dismissed these claims without prejudice and gave Plaintiff leave to amend in order to adequately plead the defendants' personal involvement in the conduct alleged. *Id.*

Plaintiff filed its Amended Complaint on February 20, 2021, reasserting its claims for injunctive and declaratory relief against Grewal and Callahan, as well as the other individual defendants named herein. ECF No. 22. Count One seeks relief under 28 U.S.C. § 2201, and Count Two seeks relief pursuant to 42 U.S.C. § 1983. *Id.* Notably, Plaintiff does not challenge the constitutionality of any New Jersey or federal law. Rather, in both counts, Plaintiff asserts the following claims: first, Defendants violated the Due Process Clause of the Fourteenth Amendment by improperly classifying the Reformation as a "shotgun" under New Jersey law and thereafter prohibiting its sale in New Jersey, *id.* ¶¶81, 89; second, Defendants violated the Second and Fourteenth Amendments by "ban[ning] the manufacture, sale, and possession of lawful firearms" in a manner that is inconsistent with state law, *id.* ¶¶84, 93; and third, Defendants' decision to

prohibit sales of the Reformation in New Jersey was "arbitrary and capricious" and "constitute[s] an abuse of discretion," *id.* ¶¶83, 92.[4]

In characterizing the constitutional violations at issue in this case, Plaintiff alleges that "a lawful manufacturer of a lawful firearm has been unable to sell the [Reformation] in New Jersey" due to Defendants' conduct. *Id.* ¶73. As a result, Plaintiff alleges that it has been "barred from engaging in lawful commerce within the State of New Jersey and continues to suffer damages to its business, reputation, and marketability of its products." *Id.* ¶76.

Defendants filed their Motion to Dismiss the Amended Complaint pursuant to Rule 12(b)(6) on April 12, 2021. ECF No. 26-1. Defendants contend that Plaintiff's Second Amendment claim fails because there is no independent constitutional right to sell firearms and that Plaintiff's procedural due process claim fails because Plaintiff failed to avail itself of the State's process for

---

[4] In its Complaint and Amended Complaint, Counts One and Two allege that "Defendants' decision and instructions are arbitrary and capricious and constitute an abuse of discretion and/or is otherwise not in accordance with the law." *See* Am. Compl. ¶¶83, 92. Yet, Plaintiff does not cite to any law supporting this claim. Plaintiff also has never pressed this claim in the multiple rounds of briefing before this Court. In my decision issued on January 22, 2021, I gave Plaintiff leave to amend as to Counts One and Two against the state officials, and I characterized those counts as "alleg[ing] violations of the Second and Fourteenth Amendments." ECF No. 20 at 1. In the Motion before the Court, here, Defendants moved to dismiss Counts One and Two, arguing that Plaintiff failed to state a claim under the Second Amendment or the Due Process Clause, and therefore "failed to set forth a viable underlying federal claim for relief." ECF No. 26-1 at 5. Without any viable federal claim, Defendants contend that the Court lacks jurisdiction to issue declaratory relief. *Id.* at 13 and n.3. But Plaintiff did not oppose the Motion on grounds that the Court possesses jurisdiction to hear a remaining state-law claim, such as one for arbitrary and capricious state action, or otherwise argue that it has a remaining state-law claim at all. While Plaintiff's Opposition states that it is "challenging Defendants' arbitrary and capricious denial of Plaintiff's rights," ECF No. 28 at 8, again, Plaintiff simply addresses Defendants' Second and Fourteenth Amendment arguments, and it does not advance a claim under state law, supported by legal authority, for arbitrary and capricious state action. Accordingly, to the extent Plaintiff intended to bring a state-law claim, any such claim is waived. *See, e.g.*, *Griglak v. CTX Mortg. Co., LLC*, Civ. No. 09-5247, 2010 WL 1424023, at *3 (D.N.J. Apr. 8, 2010) ("The failure to respond to a substantive argument to dismiss a count, when a party otherwise files opposition, results in a waiver of that count.").

appealing final agency decisions. Plaintiff filed its Opposition on May 24, 2021, ECF No. 28, and Defendants filed their Reply on June 4, 2021. ECF No. 31.

## II.    LEGAL STANDARD

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted).  While Federal Rule of Civil Procedure 8(a)6 does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  Thus, to survive a Rule 12(b)(6) motion to dismiss, the complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To determine whether a plaintiff has met the facial plausibility standard mandated by *Twombly* and *Iqbal*, courts within this Circuit engage in a three-step progression. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).  First, the court must "outline the elements a plaintiff must plead to state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court "peel[s] away those allegations that are no more than conclusions and thus not entitled to the assumption of truth."  *Id.*  Finally, where "there are well-pleaded factual allegations, the court

should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## III.    DISCUSSION

Defendant moves to dismiss Counts One and Two for failure to state a claim. Because each count contains the same substantive claims under the Second Amendment and the Due Process Clause, I will review the substantive claims from each count together. For the reasons set forth below, I agree that Plaintiff has failed to plausibly allege a violation of the Second Amendment or the Due Process Clause. Accordingly, Counts One and Two are dismissed. Plaintiff is given leave to amend only its Second Amendment claim in accordance with the principles set forth herein.

### A.    Second Amendment Claim

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Based on the Supreme Court's decision interpreting the Second Amendment in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Third Circuit adopted a "two-pronged approach to Second Amendment challenges." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).[5] Under the first step, the Court must determine "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* "If it does not, [the Court's] inquiry is complete." *Id.* If the law burdens conduct protected by the Second Amendment, under the second step, the Court must "evaluate the law under some form of means-end scrutiny." *Id.* Although *Heller* did not specify the applicable standard of review, it rejected the rational basis

---

[5] In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court held that the right guaranteed under the Second Amendment is "fully applicable to the States." *Id.* at 750. *McDonald* "does not alter [the Court's] analysis of the scope of the [Second Amendment] right." *Marzzarella*, 614 F.3d at 88 n.3.

test, implying that some form of heightened scrutiny applies. *Id.* at 95–96 (quoting *Heller*, 554 U.S. at 628 n.27).

To determine whether the law in question burdens conduct that falls within the scope of the Second Amendment, the Court must analyze the text of the Amendment as well as the historical record that informs its meaning. *Heller*, 554 U.S. at 592, 595 (basing its analysis on "both text and history"). Applying this approach, *Heller* "concluded the Second Amendment 'confer[s] an individual right to keep and bear arms,' at least for the core purpose of allowing law-abiding citizens to 'use arms in defense of hearth and home.'" *Marzzarella*, 614 F.3d at 89 (quoting *Heller*, 554 U.S. at 595, 635) (internal citations omitted). However, the right "is not unlimited," *Heller*, 554 U.S. at 626, and *Heller* identified two types of limitations that are relevant, here. First, *Heller* does not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, *or laws imposing conditions and qualifications on the commercial sale of arms*." *Id.* at 626–27 (emphasis added). *Heller* explained "that this list of 'presumptively lawful regulatory measures' was merely exemplary and not exhaustive." *Marzzarella*, 614 F.3d at 91 (quoting *Heller*, 554 U.S. at 627 n.26). Second, "another important limitation" is that "the sorts of weapons protected" by the Second Amendment are "those 'in common use'" by "law-abiding citizens for lawful purposes," which excludes weapons that are "dangerous and unusual." *Heller*, 554 U.S. at 625, 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).

In this case, Defendants move to dismiss Plaintiff's Second Amendment claim only under *Marzzarella*'s first step, contending that Plaintiff has failed to plausibly allege any "burden on conduct falling within the scope of the Second Amendment's guarantee." *Marzzarella*, 614 F.3d at 89. Defendants make two arguments. First, they argue that no conduct protected by the Second Amendment is at issue because Plaintiff merely alleges that the State burdened its ability to sell

11

firearms, which is conduct that falls outside the scope of the Second Amendment. Second, Defendants maintain that the Reformation is not the type of weapon that the Second Amendment protects. I agree with Defendants that Plaintiff's allegations concerning the burden on its ability to sell firearms are insufficient to state a claim, and I therefore dismiss Plaintiff's Second Amendment claim on those grounds. However, at this stage, the record is not adequately developed to determine whether the Reformation is the type of weapon that falls outside the scope of the Second Amendment.

### 1. Regulation of the Commercial Sale of Firearms

In *Marzarella*, the Third Circuit elaborated on *Heller*'s examples of "presumptively lawful regulatory measures." *See* 614 F.3d at 91 (quoting *Heller*, 554 U.S. at 627 n.26). *Marzzarella* concluded that prohibitions on firearm possession by felons and the mentally ill, as well as laws forbidding individuals from carrying firearms in sensitive places, "regulate conduct outside the scope of the Second Amendment" and are therefore categorical "exceptions to the Second Amendment guarantee." 614 F.3d at 91–92. In contrast, "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment." *Id.* at 92 n.8. As *Marzzarella* reasoned, "[i]f there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms[,] [which] . . . would be untenable under *Heller*." *Id.* However, *Marzzarella* did not expand upon the scope of Second Amendment protections pertaining to regulations on the sale of firearms.

The Ninth Circuit first addressed the scope of Second Amendment protections extending to the sale and acquisition of firearms in *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017). *Teixeira* concerned a county ordinance that prohibited firearm retailers from locating their stores near certain entities or residential zones in unincorporated areas of the county. *Id.* at 674. An individual seeking to open a firearms store brought a claim on behalf of himself and his potential customers alleging that the ordinance violated the Second Amendment, because he was unable to find any

location to open a store in an unincorporated area of the county that would comply with the ordinance. *Id.* at 676. In setting out the background principles governing this claim, the court concluded that "the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Id.* at 677. "[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much,'" the court observed, "without the ability to acquire arms." *Id.* (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)). Accordingly, although *Teixeira* did "not define the precise scope of any such acquisition right," it concluded "that '[t]he right to keep arms, necessarily involves the right to purchase them.'" *Id.* at 678 (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871))

Teixeira then addressed two distinct issues arising from the plaintiff's Second Amendment claim. First, *Teixeira* concluded that, "as the would-be operator of a gun store, [the plaintiff had] derivative standing to assert the subsidiary right to acquire arms on behalf of his potential customers," *id.*, as he pleaded in his complaint. However, the court went on to hold that the plaintiff failed to state a claim on behalf of his customers because he "did not adequately allege . . . that [county] residents [could not] purchase firearms within the [county] as a whole, or within the unincorporated areas of the [county] in particular," given that there were already ten firearm retailers in the county, one of which was approximately 600 feet from the proposed site of the plaintiff's store. *Id.* at 678–80.[6] Second, *Teixeira* addressed whether the "Second Amendment grants . . . a right to *sell* firearms" that is "independent of the rights of . . . potential customers." *Id.* at 681 (emphasis in original). Based on the text and history of the Second Amendment, *Teixeira* concluded that it "does not confer a freestanding right, wholly detached from any customer's ability to acquire firearms, upon a proprietor

---

[6] The court did not state explicitly whether it reached this decision because the ordinance did not burden conduct protected by the Second Amendment, under the first step, or because the ordinance survived an applicable form of scrutiny, under the second step.

of a commercial establishment to sell firearms." *Id.* at 682. Although "[c]ommerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense, . . . the right of gun users to acquire firearms legally is not coextensive with the right of a particular proprietor to sell them." *Id.* Accordingly, *Teixeira* held that regulations implicating the ability to sell firearms, independent of the right to acquire firearms, "does not burden conduct falling within the [Second] Amendment's scope." *Id.* at 690. *Teixeira* further clarified that this "holding does not conflict with [*Marzzarella*]" because that case "did not consider a situation in which the right of citizens to acquire and keep arms was not significantly impaired, yet commercial retailers were claiming an independent right to engage in sales." *Id.* at 687–88.

After the Ninth Circuit decided *Teixeira*, the Third Circuit, for the first time, addressed a Second Amendment claim challenging a regulation implicating the commercial sale of firearms. *See Drummond v. Robinson Township*, 9 F.4th 217 (3d Cir. 2021). In *Drummond*, the plaintiff sought to reopen a firearms retail store and range that a previous owner had operated but which had closed a decade prior. *Id.* at 222–23. At the time the plaintiff leased the property, the township permitted "Shooting Ranges" in "Industrial and Special Conservation districts," and it permitted "Sportsman's Clubs" in "Interchange Business Districts (IBD)." *Id.* at 223. The property that the plaintiff had leased fell within an IBD, meaning it had to be a Sportsman's Club, but the same rules applied to both Sportman's Clubs and Shooting Ranges. *Id.* After the plaintiff leased the property, the local zoning board revised its zoning rules such that only Sportsman's Clubs, not Shooting Ranges, were required to operate as non-profit entities (the "Non-Profit Ownership Rule"). *Id.* at 223–24. The township justified this rule as a measure to "moderate[] the intensity of use at Sportsman's Clubs." *Id.* at 232. Further, the new rules prohibited Sportsman's Clubs from organizing "center-fire rifle practice," allowing them instead to engage only in "rim-fire rifle practice" (the "Rim-Fire Rifle Rule"), which was justified on grounds that it would "prevent[] the use of powerful ammunition, [thereby] reducing

14

noise and increasing safety." *Id.* at 223–24, 232. The plaintiff alleged that the new rules violated the Second Amendment by "restrict[ing] his customers' efforts to acquire firearms and maintain proficiency in their use." *Id.* at 224. As the court clarified, the plaintiff "did not assert that the . . . rules injure[d] him in his capacity as the operator of a gun range." *Id.*

*Drummond* held that the plaintiff had stated a claim under the Second Amendment. *Id.* at 225. At *Marzzarella*'s first step, the court held that the zoning rules burdened conduct protected by the Second Amendment because "neither type of regulation rests on deep historical foundations." *Id.* at 227. As relevant here, the court explained that the non-profit ownership rule "prevents businesses in certain areas from selling guns or range time at a profit." *Id.* The "closest" historical analog the court identified was to rules prohibiting the sale of "guns to enslaved or formerly enslaved people and members of Native American tribes." *Id.* at 228. But these rules were inapposite because they merely restricted certain buyers from purchasing weapons rather than the general sale of firearms to the public. *See id.* Accordingly, the non-profit ownership rule burdened conduct falling within the scope of the Second Amendment,[7] requiring the application of heightened scrutiny. *Id.* at 227–29.[8]

However, *Drummond* was careful to limit its holding based on the pleadings in the complaint. Consistent with *Teixeira*, the Third Circuit clarified that it was unaware of any "court, modern or otherwise, to hold that the Second Amendment secures a standalone right to *sell* guns or range time." *Id.* at 230 (citing Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1545 & n.437 (2009)

---

[7] The court also found no persuasive historical analog supporting the rim-fire rifle rule, *id.* at 226, although this rule is more relevant to whether the firearm is the type protected by the Second Amendment, which is addressed, *infra*.

[8] *Drummond* also went on to hold that, at the pleading stage, the rules did not survive intermediate scrutiny. *Id.* at 230.

(hereinafter "Implementing the Right to Keep and Bear Arms")) (emphasis in original). And the plaintiff in *Drummond* "[did] not ask [the court] to go so far," *id.*, as he had merely asserted a claim on behalf of his potential customers. In this regard, *Drummond* explained that it could not "equate [Second Amendment protections applicable to] gun stores with [First Amendment protections applicable to] bookstores." *Id.* "The First Amendment shields bookstores not because they inform readers' speech, but 'because [the bookstores] themselves . . . are seen as speaking by distributing material that they want to distribute.'" *Id.* (quoting Volokh, *Implementing the Right to Keep and Bear Arms*, at 1545). "The same cannot be said of gun stores" because the Second Amendment does not "secure[] a standalone right to sell guns." *Id.*

Under *Teixeira* and *Drummond*, Plaintiff here has failed to plausibly allege any burden on conduct protected by the Second Amendment because its claim is premised on the non-existent "standalone right to *sell* guns." *See Drummond*, 9 F.4th at 230. As framed in the Amended Complaint, Plaintiff has not alleged any burden on its potential customers' ability to acquire firearms. *Cf. id.* at 224 (noting plaintiff alleged that the township burdened conduct protected under the Second Amendment by "restrict[ing] his customers' efforts to acquire firearms and maintain proficiency in their use").[9] Rather, Plaintiff repeatedly refers to the burden on *its* ability to sell the Reformation. *See*

---

[9] In its Opposition, Plaintiff states that "[f]irearms dealers receive some constitutional protection as facilitators of their customers' Second Amendment rights," and that "[p]reventing the interstate sales of legal firearms to New Jersey licensed firearms dealers and ceasing legal sales from the dealers to New Jersey residents . . . is, in turn, a violation of the buyer's Second Amendment rights." ECF No. 28 at 10. However, in determining whether Plaintiff has stated a claim, the Court may only consider "allegations contained in the complaint, exhibits attached to the complaint and matters of public record," *Schmidt*, 770 F.3d at 249, and Plaintiff may not amend its complaint by way of its brief in opposition to a motion to dismiss. *Cummings v. Princeton Univ.*, Civ. No. 15-8587, 2016 WL 6434561, at *5 (D.N.J. Oct. 31, 2016); *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). But even if I were to consider such an allegation, without more, it is conclusory and therefore insufficient to state plausible claim for relief. *Bistrian*, 696 F.3d at 365.

Am. Compl. ¶1 ("[T]he defendants have violated Plaintiff's constitutional rights . . . by . . . preventing . . . the lawful sale of lawful firearms within . . . New Jersey."); *id.* ¶2 (alleging Defendants "have illegally prohibited Plaintiff from selling its lawful product"); *id.* ¶71 (describing Defendants' policy as one intended to "restrict, limit, and otherwise prevent the lawful sale of firearms into the State of New Jersey"); *id.* ¶73 (characterizing the constitutional violation as one "where a lawful manufacturer of a lawful firearm has been unable to sell the firearm in New Jersey"); *id.* ¶76 (alleging "Franklin Armory continues to be barred from engaging in lawful commerce within . . . New Jersey"); *id.* ¶77 ("Defendants utilized the color of . . . the law to . . . prohibit firearm retailers within . . . New Jersey from purchasing and selling a lawful product."); *id.* ¶¶84, 93 ("Defendants' conduct . . . violate[s] the Second and Fourteenth Amendments . . . because it bans the manufacture, sale, and possession of lawful firearms.").

The closest Plaintiff comes to satisfying step one under *Marzzarella* is in its allegation that Defendants violated the Second Amendment by "ban[ning] the manufacture, sale, and *possession* of lawful firearms." Am. Compl. ¶¶84, 93 (emphasis added). But this allegation does not specify any burden on the right to acquire firearms, *see Teixeira*, 873 F.3d at 678, and nowhere does Plaintiff allege in the Amended Complaint that it is bringing a claim on behalf of any potential customer. *Cf. Drummond*, 9 F.4th at 224; *Teixeira*, 873 F.3d at 676. Although "the *Twombly*/*Iqbal* 'plausibility' standard does not require magic words," *Agredano v. State Farm Lloyds*, 975 F.3d 504, 506 (5th Cir. 2020), the Third Circuit and others have clearly demarcated a boundary between a right to acquire firearms, which the Second Amendment protects, and the standalone ability to sell firearms, which is not protected. *Drummond*, 9 F.4th at 230; *Teixeira*, 873 F.3d at 682; *United States v. Chafin*, 423 Fed. App'x 342, 344 (4th Cir. 2011) (finding plaintiff did not point to "any authority, and [the court] found none, that remotely suggests that, at the time of its ratification, the Second Amendment was understood to protect an individual's right to *sell* a firearm") (emphasis in original). This Court must

adhere to that rule in determining whether Plaintiff has stated a plausible claim for relief.

Accordingly, Plaintiff's Second Amendment claim is dismissed without prejudice. Plaintiff is given leave to amend its complaint in accordance with the foregoing principles.

2. *Types of Firearms Protected Under the Second Amendment*

Defendants also contend that Plaintiff has failed to identify any burden on conduct protected under the Second Amendment because the Reformation is not the type of weapon to which Second Amendment guarantees extend. ECF No. 26-1 at 15–17. However, as explained herein, the record is not adequately developed at this stage to make such a determination.

The right protected under the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. "Under step one," the Court must "consider whether the type of arm at issue is commonly owned . . . and 'typically possessed by law-abiding citizens for lawful purposes.'" *Ass'n of N.J. Rifle & Pistol Clubs v. Atty. Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) ("*N.J. Rifle*") (citing *Marzzarella*, 614 F.3d at 90–91; *Heller*, 554 U.S. at 625). *Heller* also requires the Court to "examine[] whether the weapon is 'dangerous and unusual.'" *N.J. Rifle*, 910 F.3d at 116 n.16 (quoting *Heller*, 554 U.S. at 627). In *United States v. Miller*, 307 U.S. 174 (1939), the Supreme Court held that a "shotgun having a barrel less than 18 inches in length" was not protected under the Second Amendment because it was not the type of firearm that was "in common use at the time" the Second Amendment was ratified. *Id.* at 178–79; *Marzzarella*, 614 F.3d at 94 (citing to *Miller* and concluding, with respect to "short-barreled shotguns," that "the Supreme Court has made clear the Second Amendment does not protect those types of weapons"). Likewise, *Heller* "read *Miller* to say . . . that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as *short-barreled shotguns*." 554 U.S. at 625 (emphasis added).

Here, Defendants first contend that the Reformation falls outside the scope of the Second

Amendment because it is a "short-barreled shotgun," ECF No. 26-1 at 16, which *Miller*—as reaffirmed in *Heller*—excludes from the scope of the Second Amendment. 307 U.S. at 178–79; *Heller*, 554 U.S. at 625.[10] As Plaintiff acknowledges, the BATF determined that the Reformation qualifies as a "shotgun" and a "short-barreled shotgun" under the GCA. Am. Compl. ¶30. However, Plaintiff responds that *Miller* is distinguishable because it concerned a firearm that was classified only under the NFA. ECF No. 28 at 11.

Although Defendants are correct that the BATF defined the Reformation as a short-barreled shotgun under the GCA, the use of such a label alone does not establish whether the Reformation is sufficiently similar to the firearm at issue in *Miller*. Accordingly, on a motion to dismiss, I cannot decide whether the Reformation is the type of firearm *Miller* and *Heller* exclude from the scope of the Second Amendment, which is an issue that requires further factual development.

First, the text of the decision in *Miller* does not provide sufficient detail regarding the characteristics of the firearm at issue to determine whether the Reformation is comparable for purposes of Second Amendment protections. While *Miller* described the firearm at issue as "a double barrel 12-gauge Stevens shotgun having a barrel less than 18 inches in length," 307 U.S. at 175, it did not provide any additional details, such as those concerning the type of projectile the firearm used, or whether the barrel was rifled or smooth. The Court also did not discuss the broader characteristics supporting its conclusion that the firearm would not "contribute to the common defense" and was not "of the kind in [that was in] common use," such that it fell outside Second

---

[10] *Miller* did not actually use the term "short-barreled shotgun," but rather referred to a "shotgun having a barrel less than 18 inches in length," which was the term used in the NFA when *Miller* was decided. *See* 307 U.S. at 175. However, *Heller* and other lower-court decisions have referred to the firearm at issue in *Miller* as a "short-barreled shotgun." *See* 554 U.S. at 622 (explaining that *Miller* "upheld against a Second Amendment challenge two men's federal indictment for transporting an unregistered short-barreled shotgun in interstate commerce, in violation of the National Firearms Act").

Amendment guarantees. *Id.* at 178–79. Accordingly, based solely on the pleadings, I cannot determine as a matter of law whether the Reformation is the type of firearm *Miller* excludes from protection by merely comparing its characteristics to those of the firearm at issue in *Miller*.

Second, the statutory definition of a short-barreled shotgun at issue in *Miller* does not clarify whether the Reformation is the type of firearm *Miller* places outside the protections of the Second Amendment. *Miller* concerned a short-barreled shotgun as defined under the NFA, which was a "shotgun having a barrel of less than eighteen inches in length." *Id.* at 175, 178. However, at the time *Miller* was decided, in 1939, the NFA did not define the term "shotgun," *see* Pub. L. No. 73-474, and the Court therefore did not describe the characteristics that qualified a firearm as a "shotgun" under the NFA. In that regard, the statutory definition of a short-barreled shotgun under the NFA at the time *Miller* was decided does not provide any context as to whether the Reformation is a short-barreled shotgun as *Miller* understood that term. Moreover, when Congress defined the term "shotgun" under the NFA for the first time, in 1968, it included as an element the use of a "fixed shotgun shell," *see* Pub. L. No. 90-618, 82 Stat. 1213, 1231 (1968), which the Reformation does not use.[11] Thus, even assuming *Miller* understood the term "shotgun" as taking the same definition as Congress adopted in 1968, the Reformation does not necessarily fit that definition, and the record is not developed as to whether the use of a "fixed shotgun shell" was material to *Miller*'s conclusion that short-barreled shotguns fall outside the Second Amendment. Accordingly, it is premature to

---

[11] The GCA, which was also enacted in 1968, adopted a nearly identical definition of a "shotgun" as the NFA, including the requirement that the firearm "use the energy of the explosive in a fixed shotgun shell." *See* Pub. L. No. 90-618, 82 Stat. 1213, 1215. However, in 1998, Congress amended the definition of a "shotgun" under the GCA by replacing the term, "the explosive in a fixed shotgun shell," with the term, "an explosive." Omnibus Consol. and Emergency Supplemental Appropriations Act of 1999, Pub. L. No. 105-277, 112 Stat. 2681, 2681-490 (1998). This amendment created the current definition of a "shotgun" under the GCA, 18 U.S.C. § 921(a)(5), and according to the BATF, placed the Reformation within the definition of a "shotgun" under the GCA given that it does not use a "fixed shotgun shell."

determine, at this stage, whether the Reformation is the type of firearm *Miller* excludes merely by examining the statutory definition of a short-barreled shotgun applied in *Miller*.

To further develop the record for purposes of comparing the Reformation and the firearm at issue in *Miller*, either party may, for example, explore the legislative history underlying the NFA, which was enacted only five years before *Miller*. That history may shed light on the characteristics that led Congress to restrict the sale and ownership of short-barreled shotguns. Likewise, general historical sources from the period when *Miller* was decided, as well as the briefing in that case, may also illuminate the characteristics of a short-barreled shotgun that led *Miller* to conclude such firearms receive no protection under the Second Amendment. At this juncture, suffice it to say, I cannot determine whether *Miller* controls this case.[12]

Aside from whether the Reformation falls outside the Second Amendment as a "short-barreled shotgun," more broadly, it is unclear at this stage whether the Reformation qualifies as a firearm that is not "in common use" by "law abiding citizens" or as a "dangerous and unusual weapon" that is therefore unprotected under *Heller*. 554 U.S. at 627. Since *Heller*, several courts of appeals have addressed a question similar to the issue before this Court, namely, whether semiautomatic assault weapons and large-capacity magazines (LCM) receive any Second Amendment protection. Most courts concluded—or assumed—that prohibitions on assault weapons and LCMs burden conduct protected by the Second Amendment, and then upheld the prohibitions under intermediate scrutiny. *See, e.g.*, *N.J. Rifle*, 910 F.3d at 116–19 (upholding LCM ban).[13] Two

---

[12] In contrast, the Third Circuit had no difficulty in deciding, on a motion to dismiss, that the Second Amendment does not extend any protection to "an M–16–style machine gun," which the appellant sought to manufacture, because *Heller* explicitly suggested that "'M–16 rifles and the like'" are unprotected. *See United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial Number: LW001804*, 822 F.3d 136, 141–42 (3d Cir. 2016) (quoting *Heller*, 554 U.S. at 627–28).

[13] *See also Worman v. Healey*, 922 F.3d 26, 36, 39 (1st Cir. 2019) (upholding semiautomatic assault

courts decided, under step one, that prohibitions on either semiautomatic assault weapons or LCMs do not burden conduct protected by the Second Amendment. *See Kolbe v. Hogan*, 849 F.3d 114, 135 (4th Cir. 2017) (en banc); *Friedman v. City of Highland Park*, 784 F.3d 406, 410–11 (7th Cir. 2015). But both courts relied on fully developed records following motions for summary judgment, and based on the record, each court examined whether the firearms at issue were in "common use" for "lawful purposes" or shared characteristics with those which *Heller* excluded from the Second Amendment's protections. For example, *Kolbe* assessed whether semiautomatic assault weapons share the characteristics that make an M-16 rifle "most useful in military service" and therefore unprotected under *Heller*. *See* 849 F.3d at 136–37. Likewise, *Friedman* examined whether the features of a semiautomatic assault rifle were typical of firearms that were in "common" use at the time of ratification[14] or "have 'some reasonable relationship to the preservation or efficiency of a well regulated militia.'" *See* 784 F.3d at 410–11 (quoting *Heller*, 554 U.S. at 622–25).

Here, the record is not sufficiently developed to conclude that the Reformation is the "type of weapon" that falls within the scope of the Second Amendment. *Heller*, 554 U.S. at 622–23. Nothing in the record establishes whether the features of the Reformation amount to the type of firearm that is "in common use" for "lawful purposes." *Heller*, 554 U.S. at 624, 627. On this Motion, facts such

---

weapon and LCM ban); *N.Y. State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015) ("*N.Y. State Rifle*") (same); *Fyock v. Sunnyvale*, 779 F.3d 991, 1001 (9th Cir. 2015) (upholding LCM restriction); *Heller v. District of Columbia*, 670 F.3d 1244, 1261–62 (D.C. Cir. 2011) ("*Heller II*") (semiautomatic assault rifles and LCMs).

[14] While *Friedman* examined whether the weapons at issue "were common at the time of ratification," 784 F.3d at 410, the Supreme Court subsequently clarified that, under *Heller*, "the Second Amendment 'extends . . . to . . . arms . . . that were not in existence at the time of the founding.'" *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (per curiam). Thus, as *N.J. Pistol* instructs, the proper inquiry is "whether the type of arm at issue is commonly owned . . . and 'typically possessed by law-abiding citizens for lawful purposes.'" 910 F.3d at 116 (quoting *Heller*, 554 U.S. at 625).

as the prevalence of firearms similar to the Reformation or the typical uses of such firearms have not been developed. *Cf. N.Y. State Rifle*, 804 F.3d at 255–56 (discussing data in the record concerning levels of manufacturing and ownership, as well as typical uses, of semiautomatic assault rifles, before concluding record was inconclusive as to whether Second Amendment protects semiautomatic rifles and LCMs); *Heller II*, 670 F.3d at 1261 (similar analysis and conclusion concerning semiautomatic rifles).[15] Nor does the record establish whether the Reformation is "dangerous and unusual" under *Heller*. 554 U.S. at 627. And unlike in *Kolbe*, where the court concluded that semiautomatic assault weapons are "unquestionably most useful in military service" because the record established that their core features "'serve specific, combat-functional ends'"[16] and their rates of fire "are nearly identical" to that of an M-16, the record before me does not provide a basis for determining whether the Reformation is "most useful in military service." *See* 849 F.3d at 136–37.

As the previous discussion illustrates, the label affixed to a firearm may not always be dispositive in determining whether it is the "type of weapon" that *Heller* excludes from Second Amendment protection. 554 U.S. at 622–23. Indeed, Plaintiff purports to have designed a firearm that qualifies as a "shotgun" under the GCA, but as neither a "shotgun" nor a "rifle" under the NFA, and as neither a "shotgun," "rifle," nor "pistol" under New Jersey law. *See* Am. Compl. Ex. B. On a

---

[15] Defendants submit that the Reformation could not be "commonly owned" or "typically possessed by law abiding citizens," *Heller*, 554 U.S. at 625, because Plaintiff alleges that it "is a novel type of firearm that is 'unique in its design and characteristics' such that it does not readily fit within existing firearms definitions." ECF No. 26-1 at 17. But this case arose in the first place because the State determined that the Reformation qualifies as a shotgun under state law. *See* Am. Compl. Ex. G. And the BATF classified the Reformation as a shotgun under the GCA. Am. Compl. ¶30. The Reformation therefore appears to bear striking similarities to firearms that the law already codifies. Thus, I am unable to determine based merely on Plaintiff's characterization that the Reformation is the type of firearm *Heller* excludes.

[16] In this regard, *Kolbe* focused on features "such as flash suppressors, barrel shrouds, folding and telescoping stocks, pistol grips, grenade launchers, night sights, and the ability to accept bayonets and large-capacity magazines." 849 F.3d at 137.

fully developed record, it may become clear that the Reformation does in fact qualify as a short-barreled shotgun, as *Heller* and *Miller* used that term. The Reformation also shares many characteristics with semiautomatic assault weapons,[17] which two courts of appeals have held to fall outside the Second Amendment altogether. *See Kolbe*, 849 F.3d at 135; *Friedman*, 784 F.3d at 410–11. A fully developed record will demonstrate whether the Reformation is unprotected on similar grounds.[18] These are issues that the parties may develop following discovery on a motion for summary judgment.

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Second Amendment claim on grounds that the Reformation falls outside the scope of the Second Amendment is denied.

### B.     Due Process Claim

Defendants also move to dismiss Plaintiff's procedural due process claim on grounds that Plaintiff has failed to pursue state processes available to challenge the July 17, 2019 Letter. I agree,

---

[17] *Kolbe* recognizes "flash suppressors, barrel shrouds, folding and telescoping stocks, [and] pistol grips," among other features, as common characteristics of a semiautomatic assault weapon that make the firearm most useful in a military setting. 849 F.3d at 137. Similarly, *Friedman* notes that "barrel shrouds" and "muzzle brakes" are common features of semiautomatic assault rifles that differentiate them from firearms protected under the Second Amendment. 784 F.3d at 410. Notably, the Reformation appears to share many of these characteristics. *See* Am. Compl. Ex. B (indicating that the Reformation includes a "flash hider," an extending stock, what appears to be a pistol grip, a "hand guard," and a "semiautomatic action"). Indeed, the State concluded that the Reformation qualifies as an "assault weapon" under New Jersey law as a semi-automatic shotgun with a magazine capacity exceeding six rounds, Am. Compl. Ex. G, although Plaintiff challenges this determination.

[18] Plaintiff characterizes *N.J. Rifle* as holding that "semi-automatic firearm[s]" are "typically possessed by law-abiding citizens" and thereby protected under the Second Amendment, ECF No. 28 at 11 n.6, but *N.J. Rifle* reached no such conclusion. *N.J. Rifle* "assume[d] without deciding that [large-capacity magazines] are typically possessed by law-abiding citizens for lawful purposes." 910 F.3d at 117. It made that assumption in part because the record demonstrated that "millions of magazines are owned" and "often come factory standard with semi-automatic weapons." *Id.* at 116. But *N.J. Rifle* only addressed a prohibition on large-capacity magazines, *id.* at 110, not on semiautomatic weapons, and it did not hold—or even assume—that semiautomatic assault weapons are a type of weapon protected under the Second Amendment.

and Plaintiff's procedural due process claim is therefore dismissed.

To state a procedural due process claim, the plaintiff must first demonstrate that "the interest [at stake] is one within the contemplation of the 'liberty or property language of the Fourteenth Amendment.'" *Powell v. Weiss*, 757 F.3d 338, 341 (3d Cir. 2014) (quoting *Jago v. Van Curen*, 454 U.S. 14, 17 (1981)). If the plaintiff plausibly alleges "that the interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it." *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000).

"[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) (internal quotation marks and citations omitted). Thus, to state a claim, "a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Id.* "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Id.*

Here, Plaintiff's procedural due process claim fails because it has not availed itself of state processes through which it may appeal the July 17, 2019 Letter. Under the New Jersey Rules of Court, the Appellate Division is "vested with exclusive jurisdiction to review any action or inaction of a state administrative agency." *Mutschler v. N.J. Dep't of Envtl. Prot.*, 337 N.J. Super. 1, 9 (App. Div. 2001). The rules provide that "appeals may be taken to the Appellate Division as of right . . . to review final decisions or actions of any state administrative agency or officer, and to review the validity of any rule promulgated by such agency or officer." N.J.R. 2:2-3(a)(2). It is undisputed that the Division of State Police, which issued the July 17, 2019 Letter, is a state administrative agency. *See Bullet Hole, Inc. v. Dunbar*, 335 N.J. Super. 562, 579 (N.J. App. Div. 2000) ("It is undisputed that the State Police is an 'agency' to which the Administrative Procedure Act applies."); *see also*

N.J.S.A. 52:14B-2 (providing that a "state agency" or "agency" includes "the principal departments in the executive branch of the State Government, and all boards, divisions, commissions, agencies, departments, councils, authorities, offices or officers within any such departments"). Further, after considering briefing on the impact of the July 17, 2019 Letter, in my Opinion in this case dated January 22, 2021, I concluded "that the administrative action, here, [the July 17, 2019 Letter,] is for all intents and purposes a final determination." ECF No. 20 at 12. However, Plaintiff failed to appeal that agency action to the Appellate Division, both after receiving the letter initially and after my Opinion issued on January 22, 2021.[19] Because Plaintiff has not alleged that the State's "processes are unavailable or patently inadequate," its failure to appeal the July 17, 2019 Letter to the Appellate Division is fatal to its procedural due process claim.

Plaintiff offers various rebuttals, none of which is persuasive. Plaintiff posits that the July 17, 2019 Letter was not a final determination because it used the word "appears" in classifying the Reformation as a shotgun and states that the letter "is not intended as legal advice but is offered for informational purposes only." ECF No. 28 at 12–13. However, the letter's intent is evident. It states that "the Firearms Investigation Unit *has determined* that your firearms appear to fit the category of a shotgun" and that "*they do not meet the statutory requirements* of legal shotguns in New Jersey." Am. Compl. Ex. G (emphasis added). Even assuming there is some ambiguity as to whether the letter constitutes a final action, agency "inaction" is also grounds for appeal to the Appellate Division. *Mutschler*, 337 N.J. Super. at 9. Likewise, Plaintiff's claim based on the letter's statement that it "is

---

[19] Plaintiff does not dispute that it could have appealed the State Police's action to the Appellate Division, and the Appellate Division has in fact entertained challenges to actions taken by the State Police. *See, e.g.*, *Bullet Hole, Inc.*, 335 N.J. Super. at 566–67, 578 (hearing challenge to State Police procedures for implementing firearm background checks); *Div. of State Police v. Jiras*, 305 N.J. Super. 476 (App. Div. 1997) (hearing appeal of officer's dismissal from Division of State Police due to misconduct).

not intended as legal advice," ECF No. 28 at 13, is meritless. Given that it sent the letter from the "Office of the Attorney General," ECF No. 22 Ex. G, the State reasonably clarified that it was not providing legal advice in response to Plaintiff's request for legal guidance, thereby preventing the creation of an attorney-client relationship. *See* Restatement of the Law Governing Lawyers § 14 (providing that an attorney-client relationship forms when a person manifests an intent to receive legal advice and the attorney manifests "consent to do so" or fails to manifest "lack of consent to do so"). Finally, Plaintiff's contention that "the letter did not provide the Plaintiff with an opportunity or an avenue to challenge the decision" is unavailing. *See Rizzo v. Connell*, Civ. No. 10-4136, 2012 WL 32206, at *10 (D.N.J. Jan. 5, 2012) (denying procedural due process claim on grounds that "Plaintiff cannot avoid [an adequate] procedural remedy simply because he was told that he had no remedy; there is an independent duty placed upon a citizen to determine this for oneself").

For the foregoing reasons, Plaintiff's procedural due process claim is dismissed with prejudice.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' Motion is **GRANTED**. Plaintiff is given leave to amend its complaint only in order to plausibly allege its Second Amendment claim, consistent with the principles set forth in this Opinion. An appropriate form of Order is filed herewith.

Date: November 29, 2021                                          /s/ Freda L. Wolfson
                                                                Hon. Freda L. Wolfson
                                                                U.S. Chief District Judge